CARLISLE B. ROBERTS, Judge.
 

 This is an inheritance tax case. Karl Jack Riensche died on April 7,1974, leaving 3,253.51 acres of unimproved real property, located in specific tax lots in Secs. 2, 3, 4, 9, 10, 14, 15, 16, 21, 22 and 28 inT 17 S, R 6 W, WM and in Sec. 1, T 17 S, R 7 W, WM, in Lane County, Oregon. ORS 118.150(1) specifies that the value of property for inheritance tax purposes is its true cash value as of the date of death of the decedent.
 
 See OAR
 
 150-118.150G).
 
 [1]
 

 The subject property consists of unimproved land, much of which was logged some 25-35 years ago. At present, most of the merchantable timber is second-growth Douglas fir, ranging from 25 to 40 years old. These stands are generally well stocked but "clumpy.” Fifty to 70-year old low-grade Douglas fir residuals are scattered throughout the property. (PI Ex 2, ltr; Def Ex A, 5.) The court viewed the site.
 

 
 *[306]
 
 The dispute over the value of this property is a long one. An inheritance tax return for the decedent was filed with the defendant in January 1975, reporting a total value for bare land, reproduction timber and merchantable timber of $286,791. The Department of Revenue’s Audit Division, after reviewing the return, notified the decedent’s personal representative, in July 1975, that the value should be $1,339,015. Throughout 1976, the parties engaged in futile attempts to reconcile these unusually disparate alleged values, without satisfaction (although the department did lower its initial estimate to $1,127,000). (Tr 4.) During this time, the plaintiff turned to Mr. Ronald O. Gibson, a consulting forester doing business as Professional Timber Management, Veneta, Oregon, for expert aid in valuation. Mr. Gibson had particular familiarity with the property. Beginning in 1973, representing McFarland Lumber Company, of Eugene, he had contacted Mr. Karl Jack Riensche and "traveled most of his property * * * in the early part of ’73 * * * with the idea of writing him a management plan and possibly doing some of the logging, too.” (Tr 36.)
 

 The decedent’s estate initially employed Mr. Gibson to "conduct an intensive walk-through analysis and cruise and complete that [cruise] in the fall of 1976.” (Tr 37.) At that time he estimated the volume of merchantable timber (12 inches dbh and larger) to be 1,740,000 board feet. (Tr 38.) Copies of Gibson’s cruise and appraisal were given to the Audit Division, Department of Revenue, in December 1976. Thereafter, on February 10, 1977, the Audit Division issued its notice of proposed inheritance tax deficiency and a hearing was set before the department for June 20, 1977. This hearing was postponed to permit a department appraiser, Mr. Schmidt, to prepare a new appraisal of the property. Mr. Schmidt proposed, and the Deputy Director of the Department of Revenue found, that the highest and best use of the 3,253.51 acres was development into parcels of 80 to 100 acres to be used for rural homesites or timber production, or both, and
 
 *[307]
 
 that its true cash value on the date of death was $1,906,000. These conclusions were set out in the Deputy Director’s Opinion and Order No. IH 77-13, dated January 5, 1978. The personal representative appealed therefrom by filing a complaint in this court on March 6, 1978.
 

 Mr. Jack F. Gartz, a property appraiser in the Timber Section of the Department of Revenue, was then instructed by the department to make an independent reappraisal of the subject property in preparation for the trial in this court, set for September 1, 1978. However, when plaintiff learned that Mr. Gartz would testify to a volume of merchantable timber on the subject property of some 8,000,000 board feet, grossly exceeding Mr. Gibson’s estimate, trial was postponed while the counsel for the respective parties sought to ascertain the factors which led to the startling difference.
 
 [2]
 
 No satisfaction being obtained, plaintiff, in the late fall of 1978, contracted with Mr. Gibson to make a thorough reappraisal of the subject property for purposes of this trial, using a prism cruise.
 
 [3]
 
 (Tr 38
 
 *[308]
 
 et seq.;
 
 see
 
 PI Ex 2.) Based on this reappraisal, plaintiff determined that the merchantable timber (12-inch dbh and larger) to be 1,979,000 board feet, as of the date of death, with a true cash value of $114,718 which, with the addition of the value determined for the forest land and reproduction thereon of $377,310, gave a total value of $492,028 (approximately $151 per acre).
 

 The study and exchange of information by appraisers and counsel did result in a stipulation, filed October 3, 1979, that the " 'highest and best use’ for the subject property involved in this case is for timber production and the sale thereof in the timber market” (not for the development of rural homesites as held in the opinion and order from which this appeal is taken).
 

 Mr. Gartz, as expert appraiser for the defendant, found 8,900,000 board feet of merchantable timber, valued at $783,200, and forest land and reproduction timber (3,180 acres at $300 per acre) valued at $954,000, for a total of $1,737,200 as of the date of decedent’s death (Def Ex A, 25). His definition of "merchantable,” also, was a tree 12-inch dbh and larger that would be utilized down to five-inch top diameter, diameter inside bark. This minimum size is considered by both appraisers to be a "small log.” (Tr 261-263.)
 

 It can be inferred that the plaintiff and Mr. Gibson were fortified in Gibson’s conclusion of the comparatively low volume in the Gibson 1978 cruise (as compared to the Gartz cruise) because they were aware of a less intensive cruise of the subject property made by Steven A. Goeller, Senior Appraiser at Weyerhaeuser Company’s Springfield, Oregon, plant in May 1974, the month following decedent’s death. Mr. Goeller, an expert timber cruiser, was plaintiff’s first witness in this suit. He testified that, on behalf of Weyer-haeuser’s "Tree Farm Family Program,” he had offered the plaintiff an inventory cruise of the subject property. This was to provide the owner "* * * a tool to help manage their property * * (Tr 13.) Mr. Goel-
 
 *[309]
 
 ler and an assistant began with study of the latest aerial photographs, typed out the entire property according to species, site, age and stocking, went into the field and adjusted these findings by examination of each type, and cruised the merchantable types, using center strips and 192 full-circle prism plots. The standard for merchantable timber was a minimum log of 16 feet in length with a four-inch top (including trees down to six inches dbh). Mr. Goeller found 4,977,540 board feet of "merch,” using a minimum log smaller than the standard used by Gibson and Gartz. (Tr 10-16.)
 

 After four days of trial, followed by prolonged study of 51 exhibits, 484 pages of transcribed testimony and lengthy post-trial memoranda, the court, nevertheless, has found it impossible to reconcile the difference of $1,245,072 in the values found by the two honest, competent, equally experienced, expert timber cruisers, who were rigorously examined and cross-examined by diligent, zealous and able counsel.
 
 [4]
 
 The extreme variance found here is a vivid reminder that not only is the problem in the instant case a complex one but that appraisal of timber and forest land is far from being a scientific exercise. As this court noted in
 
 Starker v. Dept. of Rev.,
 
 6 OTR 10, 12 (1975):
 

 "All property valuation contains aspects of personal judgment but timber valuation may well lead all other categories in this regard. * * *”
 

 The burden of proof, of coursé, initially falls upon the plaintiff. The court must base its conclusion upon a preponderance of the evidence (ORS 305.427); that is,
 
 *[310]
 
 upon consideration of all the evidence, pro and con, the "preponderance” will be that part which is more convincing to the court and produces in the judge’s mind a belief that what is sought to be proved by one party is more likely to be true than the evidence offered in opposition.
 
 See Cook v. Michael,
 
 214 Or 513, 525-528, 330 P2d 1026 (1958);
 
 Stattes el al v. U. S,
 
 63-2 USTC ¶9755, 12 AFTR2d 5757 (SD WVa 1963). The court is given some scope in piecing together acceptable evidence from all the parties in an effort to render the most rational decision, inasmuch as ORS 305.435 provides:
 

 "* * * Where the determination of true cash value * * * is an issue before the court, the court has jurisdiction to determine such value on the basis of the evidence before it, without regard to the values pled by the parties.”
 

 Messrs. Gibson and Gartz showed that they were in agreement as to the broad outlines of their basic procedure. After ascertaining the perimeters of the subject property, through the use of the records and maps of the County Assessor of Lane County and relying heavily on the use of aerial photography, each appraiser undertook to ascertain the volume of merchantable timber on the property at the date of his 1978 cruise, adding thereto the merchantable timber logged between 1974 and 1978, and then reducing the volume to that which would have been found on the property at the date of death in 1974, and to ascertain the fair market value at the date of the decedent’s death of the volume thus found; next, to ascertain the acres of nonmerchantable timber as of the date of death, the site values thereof, the age and types of this "reproduction” timber and the market value thereof as of April 7, 1974. The total dollar amounts thus derived should represent the true cash value of the whole property as of the date of death.
 

 In their individual searches for the volume of merchantable timber upon the subject property, both Mr. Gibson and Mr. Gartz spent many days personally
 
 *[311]
 
 examining the sites and measuring the stumpage.
 
 [5]
 
 Mr. Gibson, using a grid system of plots on all sections of the property except Secs. 1, 14 and 22, with a prism 20 BAF, cruised all the merchantable timber and measured the amount of nonmerchantable timber. Samples of age were obtained from each plot by boring one or two representative trees and counting the whorls to determine the age of each stand. One or two tarif
 
 [6]
 
 trees were selected in each plot; the diameter of the trees was measured to the nearest tenth of an inch and the height to the nearest tenth of a foot. Tree volumes were ascertained by using the log scales found in the Washington tarif tables for Douglas fir.
 
 [7]
 
 Tarif trees were also used as site trees to measure growth rates of the trees. Mr. Gibson found that the growth rates varied by types from .34 to .55 inches annually, that the rates of growth very markedly during periods of a tree’s life and that the pertinent type acreages varied from five to 100 acres. As stated in Mr. Gibson’s appraisal report, PI Ex 2, 5: "Clearly, growth rates vary widely depending on site class, tree age and spacing of trees. Therefore, it is necessary to determine the growth rate for each timber stand and
 
 *[312]
 
 apply it only to that stand.”
 
 [8]
 
 Each sample tree was checked for defect.
 

 In working back from the tree diameter of 1978 to that of April 1974, Mr. Gibson deemed it necessary to take into account two growth factors in each stand. The first growth factor was to decrease the diameter of every measured tree by the amount of average growth rate for that type for a period of five growing seasons. (Tr 41.) The second growth factor measured was based upon a basal area plot factor, using a prism. The basal area of the plot decreases with age. Mr. Gibson accounted for this decrease by using a ratio of plot-radius factor for 1974 over plot-radius factor for 1979:
 

 "* * * and if you cancel all the other things out, mathematically it comes down to your diameter squared over diameter squared and you multiply that times your — your volume per acre and you — you reduce it back to ’74. So there were two factors working to adjust volume back to ’74. * * *” (Tr 43.)
 

 In his search for volume of merchantable timber and the type and amount of unmerchantable stump-age, Mr. Gartz made a linear cruise (rather than a grid),
 
 [9]
 
 walking 13 miles of cruise lines (Def Ex A, 6). He recorded nonmerchantable timber by diameter class in order to compute basal area per acre using a prism 17.36 BAF. He bored and measured additional trees to ascertain annual average diameter increment and average site class increment. He testified that young growth Douglas fir diameters increase at an average of .33 inch per year, which would amount to
 
 *[313]
 
 1.32 inches over four growing periods. His determination of diminution in volume is illustrated by his Table 3 in Defendant’s Exhibit A, 10, using diameters from 10 inches to 22 inches. Using his computations (without the niceties and refinements deemed important by Mr. Gibson), he reduced the total 1978 merchantable volume found by him of 11,772.8 MBF to a 1974 level of 8,900.2 MBF.
 

 Having determined the volume of merchantable timber on the subject property, the next task of the appraiser was to determine the stumpage value as of the date of death (or close to that date). Both appraisers used the "conversion return method” (although using different words to describe it). Basically, this method required the witnesses to ascertain the 1974 value of camp run logs, delivered at the mill, and to subtract therefrom the various costs of converting the standing tree into a log and hauling it to the millsite (falling, bucking, yarding, loading, hauling, including road maintenance, the miscellaneous expenses of payroll taxes, overhead, engineering, supervision, and consideration of profit and risk).
 

 Mr. Gibson approached his task "from the viewpoint of management.” (Tr 55.) He made use of his experience as a logger and employer of loggers and his sales to local mills and records maintained by him from 1972 through 1979 (as part of his occupation as a consulting forester). (Tr 58-64.)
 
 [10]
 
 As one consequence, he differed from Mr. Gartz in that he established two categories for the determination of logging costs; i.e., the first category consisted of prime stands of merchantable timber containing 3 MBF or more per acre; the second, the costs of logging younger, marginal
 
 *[314]
 
 stands bordering on unmerchantability with 1 MBF to 2.9 MBF per acre. He testified:
 

 "* * * Due to the low volume, scattered, limby nature of the 1 MBF to 2.9 MBF stands, log production was estimated to be barely one load per day. In the prime stands, log production probably exceeded two loads per day, thereby reducing the $ per MBF logging rate.” (PI Ex 2, ltr, 2.)
 

 "* * * This type of timber, when we’re looking at a liquidation value, which basically [is] what you’re doing when you do an appraisal on — on small timber because you wouldn’t naturally, under economic conditions, even cut it because it’s growing too fast. But the liquidation value forces you to look at timber that’s really submer-chantable as far as logging costs go and I had to make a category called 1,000 board feet to 2.9 thousand board feet per acre.” (Tr 61.
 
 See also
 
 Tr 83-84.)
 

 Mr. Gartz’s 1974 camp run log value was derived from data collected in 1974 by the Department of Revenue personnel (none of whom appeared in the suit). "This information was collected directly from the log purchase agreements and purchase invoices of the individual companies named.”
 
 [11]
 
 (Def Ex A, 23-25.) The five mills named were relatively remote from the subject property compared to those named by Mr. Gibson. However, his net value of the logs delivered to the mill, for the logs in Mr. Gibson’s first category, was reassuringly close to the value found by Mr. Gartz for all logs (holding in mind that there is always quite a range in log prices): Mr. Gibson developed a stumpage value of $90 per MBF and Mr. Gartz $88. However, while Mr. Gartz used his $88 figure for all the stump-age, Mr. Gibson, for his second category, obtained a value of only $34 per MBF.
 

 The court finds the logic of Mr. Gibson’s testimony the more persuasive, inasmuch as his personal
 
 *[315]
 
 experience and close proximity to the logging scene in the area of the subject property, together with his definitive treatment of the practical problems of logging, added substance to his testimony. (Throughout Mr. Gibson’s testimony, it was notable that he "painted with a fine brush,” whereas Mr. Gartz used a "broad brush” (to adopt a figure of speech used by plaintiff’s counsel).)
 

 The court finds that Mr. Gibson’s determination of volume of merchantable timber is more convincing than Mr. Gartz’s conclusions. Although both timber cruisers appear to have spent more time on the property and to have obtained more detail than is commonly observed in the presentations made in this court, the court accepts Mr. Gibson’s testimony that a good system of plots in a square pattern is superior in accuracy to a linear cruise; that a prism 20 BAF was better suited in the subject property than a prism 17.36 BAF;
 
 [12]
 
 that a measure of diameters to the nearest inch, rather than the two-inch allowance used by Mr. Gartz, was superior; that his measure of growth rates and application thereof were much more specific than the simple average used by Mr. Gartz; and, since Mr. Gartz reduced diameters through only four growing seasons when five were admittedly applicable, Mr. Gartz’s final result was too large by at least 20 percent.
 

 The next problem presented to the appraisers was the determination of the true cash value of the bare land and the nonmerchantable timber and ground cover comprising the subject property, as of the critical date. This requires a detailed knowledge of the topography (with a view to future logging), the site classes, the timber types (species, age, stocking, defect), nega
 
 *[316]
 
 tive factors (brush, marsh, rocky outcrops) and nonfor-est uses. Accessibility, conditions of roads and ease or difficulty of road building are just a few of the many factors to be considered by the expert cruiser. Most of this information will be accumulated simultaneously with the cruise of the merchantable timber.
 

 Having segregated the nonmerchantable from the merchantable timber and with a good inventory of the pertinent acreage, the determination of the value thereof is best found through the "market data approach”; that is, the use of sales of other property which occur on or about the time of the valuation date and which are as closely similar as possible to the subject property with respect to the many factors which affect value.
 
 Menasha Corp. v. Dept. of Rev.,
 
 6 OTR 313 (1976).
 

 Mr. Gibson described the subject property, in general, as follows:
 

 "In March 1974 the Riensche property could best be described as a good growth prospect. Forty-four percent of the pre-merchantable stands would be merchantable within 5 years. Another 39 percent would be merchantable within 15 years. Roughly 83 percent of the pre-merch. stands on 2,700 acres would grow into the merch. timber category by 1989.
 

 "Annual growth rates range from 5.7 percent to 78 percent with an average of 27.5%. Board foot volume growth on Riensche ranges from 270 to 1,100 board feet per acre per year, with an average of 564 board feet.
 

 "Clearly, growth rates vary widely depending on site class, tree age and spacing of trees. Therefore it is necessary to determine the growth rate for each timber stand and apply it only to that stand.” (PI Ex 2, ltr, 5.) Mr. Gibson’s attack on the problem by accumulating a store of detailed facts regarding the specific land and the forest cover thereon has impressed the court, as reflected above in the discussion of the volume and value of merchantable timber. However, the key to his work, the selection of "comparable” sales, caused him much difficulty and, by the same token, diminished the court’s confidence in the results.
 

 
 *[317]
 
 Mr. Gibson has had substantial personal experience in the purchase of forest land, on behalf of his former employers and of himself, and he is thoroughly familiar with the indicia which should be considered. (Tr 64, 65,154.) The factor of size of a given property was very much in his mind. Since 3,253.51 acres are here involved, he felt that no comparable sale of less than 2,000 acres should be used. (Tr 65.) Except for sales exceeding 40,000 acres, he could find no Lane County transactions within his preferred parameters relatively close in time to April 1974, except a sale of 3,920 acres, Tripp to Weyerhaeuser Company, dated November 1972, and an 18,000-acre sale, American Can Company to Bohemia Lumber Company, in October 1972. However, he felt that these:
 

 "* * * were pretty representative samples — sales because they had a good spread of age classes. They weren’t purchased exclusively for the timber. They were purchased for the land base as well as the timber, and so I knew that reproduction had — had some input and also site class into what they actually paid for these properties. * * * yeah, they’re a little over a year old for these sales. * * * So I was stuck with using two 'comp’ sales. Fortunately, these two 'comp’ sales bracketed Riensche in site class and age class distribution. The Tripp sale had slightly lower of age class, slightly younger reproduction, and it didn’t have very much volume per acre. * * * The American Can sale was slightly better site class than Riensche. It had about the same age reproduction, but it had more second growth timber and it had a little bit of old growth timber on it. I knew that both of the buyers were knowledgeable buyers and they had expert appraisal staffs so that there was apparently, to me, from looking at what they paid and looking at what was on the ground, they actually paid for what they thought was there. So I didn’t see any other considerations evident like chip deals or things that would cloud ’em up. They looked like they were bona fide transactions. So I — I was forced to use these two. I cruised both of these properties thoroughly. In fact, I wrote a management plan for American Can by coincidence in ’71 or ’72 so I had a real good working knowledge of that 18,000 acres. The Tripp property, I — I had to go over every 40-
 
 *[318]
 
 acre piece in every section and look at it and type it out * * * ” (Tr 65-66.)
 

 On the basis of his study, Mr. Gibson determined that the bare land and reproduction timber value of the subject property was $115.97 per acre for a total of $377,310 ($115.97 times 3,253.51 acres).
 

 Mr. Gartz was familiar with the sales of Tripp to Weyerhaeuser Company and American Can to Bohemia Lumber Company but he decried their use. He was also strongly of the opinion that the factor of size, in choosing comparable sales, was not significant where forest land is involved. In his testimony, after listing many of the factors to which consideration must be given in determining degree of comparability, he stated:
 

 "* * * Now, unlike Mr. Gibson’s choice of compar-ables, in this particular instance I did not think that size, for size itself, was of too much concern, or at least it should not be controlling, because it is my opinion — my feeling that when you deliberately go out to select com-parables on the basis of size alone, the mere fact that they’re large sales involve so many characteristics which in their sum total become almost diametrically opposed to the characteristics of the subject. So it is my firm opinion that because we have a moderately sized sale here that size has to be controlling. There are more things important than that. And along with that line of thinking, I have heard this theory, if you want to call it a theory, that a value of a property decreases [per acre] solely because of [increased] size [of the total parcel]. I have heard this theory for quite a number of years but as yet, if this is such an all-prevailing philosophy in the timber industry in the acquisition of timberland, it surprises me that I have never seen a definitive written study outlining just exactly where size has an effect upon value per acre. * * *” (Tr 312.)
 

 Mr. Gartz testified that the Timber Section of the Department of Revenue was constantly collecting and analyzing sales of private forest properties and making field examinations of these properties. Turning to the department’s data bank, he found there were near
 
 *[319]
 
 ly 100 Oregon sales in 1974 which might be considered potential comparable sales for use in this appraisal. However, when he studied these data, he was able eventually to select only three sales (two in Lane County, one in Polk County), the comparability of which
 

 "* * * centered around the relative quality as determined by the following items:
 

 "1. Proportion of the total reproduction acres in reproduction Classes A, B, and C (A- 50 to 110 ft.² basal area/acre, B- 30 to 50 ft.² basal area/acre, C- 30 or less ft.² basal area/acre). An additional class X was included to represent unstocked lands.
 

 "2. Proportion of the total area of the property in forest land Classes C, D, E, F (C- Site Classes II— to III + , D- Site Class III, E- Site Classes III- to IV + F-Site Classes IV to IV—).” (Def Ex A, 14.)
 

 These three properties, designated by him as "May-cumber,” "Keen,” and "Redner,” upon analysis were found to have substantially varying percentages, both of reproduction in classes A, B and C and percentages of reproduction in forest land classes C, D, E and F. (Def Ex A, 15.) Recognizing that, with four classes of reproduction quality and four classes of land quality, 16 combinations of these classes were possible, when applied to the subject and the comparable properties (Def Ex A, 17), he decided to use the data to develop a numerical expression or "quality index” for the forest land and reproduction for the subject and in each "comparable” property. He testified that the numerical values used for the forest land quality classes and reproduction of quality classes were taken from acre value tables developed by the Department of Revenue (but, since the values had not been developed by him, he was not personally able to testify as to the validity of these multipliers. Some testimony on these "com-parables” was given by defendant’s second expert witness, Mr. James Sture
 
 {see
 
 below).)
 
 See
 
 Def Ex A, 19-21, for the results of application of the "quality index.”
 

 
 *[320]
 
 Although Maycumber, Keen and Redner with respective acreages of 450, 320 and 387, were chosen as the most comparable sales out of a hundred potential "comparables,” "the indicated per acre value for reproduction and land,” after application of Mr. Gartz’s formula, had an appalling spread: $212, $315 and $348 per acre. (Def Ex A, 21.) Based upon these figures, Mr. Gartz stated that in his judgment "the value per acre for reproduction and land of the subject should be set at $300.” Multiplied by 3,180 acres (non-forest acres being omitted by Mr. Gartz), he found a value of $904,000 for land and reproduction timber. (Def Ex A, 22.)
 

 Mr. James D. Sture was called as a'witness by the defendant to testify with respect to the Maycumber, Keen and Redner sales.
 
 [13]
 
 His testimony principally consisted of interpretation of Defendant’s Exhibit R, the Maycumber sale, Exhibit S, the Keen sale and Exhibit T, the Redner sale.
 

 He had inspected the property described in Exhibits R and T but relied on the work of Mr. David Hoyt as to Exhibit S. (Mr. Hoyt made no appearance as a witness.) His testimony does not add to that of Mr. Gartz in tying in the properties named with the subject property as "comparable properties.” He did testify that the unit values shown in Exhibits R, S and T are based upon a data bank in the Department of Revenue. "* * * At the time that this work was done, the department maintained schedules of unit values for a great number of value areas in Western Oregon for different quality classes of timber.” (Tr 443.)
 

 Mr. Sture did support the testimony of Mr. Gartz that, in the case of sales of forest land, the factor of size alone does not appear to affect the value per acre,
 
 *[321]
 
 although recognizing that there would be fewer would-be purchasers in the larger sales because fewer persons have available the necessarily large amounts of capital or credit.
 

 In view of this testimony, it would appear that there should be no objection on the basis of size to the use by Mr. Gibson of the 18,367-acre American Can sale as well as the 3,921-acre Tripp sale, other factors being equal. His detailed knowledge of these properties, as a basis for comparison with the subject property, appeared to be greater than either Mr. Gartz’s or Mr. Sture’s knowledge of the three less comparable properties chosen by the defendant. However, the testimony makes clear that there are a plethora of factors in all the alleged comparable sales offered and the court found it difficult to weigh the testimony regarding them. (For example, there was conflicting evidence that the American Can sale had an agreement for a chip supply to American Can by Bohemia for a term of years which might have had a bearing on the sales price. There was an unresolved argument over the usefulness of the Tripp sale in view of the fact that its 3,921 acres were a total of a half-dozen noncontiguous parcels scattered over Lane County.
 
 See
 
 Def Ex CC.)
 

 Testimony was given by Mr. Gibson as to factors in the defendant’s cruise which would tend to explain the great discrepancy between the state’s and the plaintiff’s conclusions as to the true cash value of the subject property for inheritance tax purposes. Mr. Gibson’s discussion of these discrepancies as relating to the volume summaries, stand characteristics, sampling methods, acreage of merchantable timber, the growth factor of the timber between 1974 and 1978, sample errors and sample intensity and the use of volume tables is reflected in a "Supplemental Report” to Mr. W. E. Riensche, dated Jume 20,1979, and found in Plaintiff’s Exhibit 2, "Supplemental Reports.” The court has been impressed by Mr. Gibson’s conclusions as stated therein.
 

 
 *[322]
 
 It has frequently been held that a person qualified as an expert in matters of land values, while testifying at a trial as to his opinion of value of land, may fortify his position by giving information upon which he relied in forming his opinion which, if offered as substantive evidence, would be subject to objection as hearsay.
 
 Cole et al v. Dept. of Rev.,
 
 6 OTR 166, 182 (1975). In each instance, the witness must explain his sources so that the value of each conclusion reached by him can be weighed by the auditor — and he should be able to withstand cross-examination. In a given case, the degree to which an expert’s hearsay is disputed may have a substantial bearing on the decision of the case. As stated by the court in
 
 Chicago and North Western Railway Co. v. Hillard,
 
 502 P2d 189, 192 (Wyo S Ct 1972):
 

 "* * * A rather general statement of the rule is that the record must show sufficient facts upon which the judgment and opinion of the expert were based. A witness who asserts an opinion of the value of property not supported by facts is not competent, and an expert’s opinion is not
 
 substantial evidence
 
 unless he can give a satisfactory explanation of how he arrived at his opinion. The expert, if relying upon a formula, should state his reasons for its adoption and its component factors and assumptions. The opinion of the expert cannot be inferred from the conclusion nor is it proof of existence of factors necessary to support it. * * *”
 

 If one witness is fully capable of explaining his multipliers and does so, and a second witness relies on a data base as to which he has no specific knowledge or control, and so is unable to make a persuasive record, the first witness logically will prevail.
 

 With each of the chief appraisal witnesses as able as the other, with full confidence in the rectitude of each of them, the court finds the more persuasive testimony to be that of Mr. Gibson. This is because of his superior knowledge of both the subject property and of his comparables and of the conditions in the area in 1974 and subsequent thereto. He was closer to
 
 *[323]
 
 the subject than were the witnesses for the defendant, his testimony constantly adverted to the practicalities of forest management and he explored the technical problems more profoundly. The defendant’s reliance on its data base tends to make its appraisals a production-line effort. This makes it difficult for a conscientious witness who must rest his results on the work of others. G5i?<?Tr 448, lines 5-24.)
 

 Although the court carries from the testimony a conviction that the plaintiff’s values are somewhat low and that defendant’s values are clearly too high, it is also convinced that the conclusions asserted by the parties are to such a degree matters of expertise that they cannot be modified by the court (pursuant to ORS 305.435) through some substituted formulation by the judge (whose only expertise is in finding a preponderance of the evidence).
 

 Inasmuch as the tax imposed comes under ORS Chapter 118 (Inheritance Taxes), not ORS Chapter 321 (1973 Replacement Part, dealing with ad valorem timber taxes), it is not necessary to allocate the values to the specific tax lots comprising the subject property. The court finds the value of the land, merchantable timber and nonmerchantable (or reproduction) timber to be $492,028. Plaintiff shall prepare a form of decree pursuant to Rule 27.
 

 [1]
 

 OAR 150-118.150(1) states: "* * * True cash value shall be taken to mean the amount in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed. * * *”
 

 [2]
 

 Mr. Gartz received his bachelor’s degree in forest management from Michigan in 1947, and his master’s degree from Oregon State University in 1953. Mr. Gibson received his bachelor’s degree from the University of California in 1962 and his master’s degree from Michigan in 1966. However, for each of them, their working experience as timber appraisers and cruisers began about 1961. Before that time, Mr. Gartz’s activity was devoted to forestry research and regeneration work, almost entirely with the Oregon State Board of Forestry.
 

 [3]
 

 The word "cruise” is a generic term and, whenever its use is critical (as in the present suit), it is essential that the witness clearly state the intended meaning in the particular instance. In its simplest form, timber cruising leads to an inventory of a forest stand, showing the quantity and quality of the forest products that can be harvested. Data will be sought as to tree quality, site quality, age of stand, species, composition, topographic information, logging possibilities, growth rate of the stand and special-use information. Management plans, logging plans, timber purchases, and timber sales are based on cruise data.
 
 See Log Scaling and Timber Cruising
 
 (1979) by Prof. J. R. Dilworth, Professor of Forest Science, Oregon State University. There are "extensive cruises” and "intensive cruises,” with all intermediate degrees of accuracy.
 

 In his 1978 cruise, Mr. Gibson used a 20-basal-area-factor prism, "* * * because there’s quite a bit of brush and if I’d have used a smaller factor prism, the accuracy would have decreased * * (Tr 39.) He deemed his use of a grid system for the prism plot to be more accurate than a linear plotstrip method used by Mr. Gartz. (Tr 81-83.)
 

 [4]
 

 The two principal appraisal witnesses who testified in this case, Mr. Gibson and Mr. Gartz, appear well matched in pertinent technical knowledge and both sought to take into account the many factors which must be considered in the valuation of timber and of forest land. Many hours of study of transcript and exhibits have led the court to conclude that each witness started his task with the expectation of making a definitive cruise in depth but, finally, due to pressures of time, had to rely in part on the conclusions of other alleged experts (who were not brought into the court), which negatively affected the foundation for some of the important testimony of each witness.
 

 [5]
 

 The testimony does not reveal Mr. Gibson’s aggregate time expended, but he made three or four cruises (of varying intensity) of the subject timber and made reviews thereof from 1973 to the time of trial. Mr. Gartz logged 35 working days in July and August 1978. (Tr 269.) Although the trial date was postponed on five occasions, each appraiser felt he "ran out of time” to complete full preparation for trial. In Mr. Gibson’s case, this was partially due to personal illness.
 

 [6]
 

 See? Turnbull, K. J., et al,
 
 Comprehensive Thee- Volume Tarif Tables,
 
 State of Washington, Department of Natural Resources, 1963, and Chambers and Jenkins,
 
 Comprehensive Log Scale Tree-Volume Tarif Tables for Douglas Lir
 
 (June 1976). (The latter citation is Defendant’s Exhibit DD.) "A tarif table is a local volume table. Tree volumes are given for various diameters within a given height class. * * *” Dilworth,
 
 supra,
 
 257.
 

 [7]
 

 The publication of Chambers and Jenkins,
 
 supra,
 
 3 states that: "For a
 
 single sample plot,
 
 select at least six sample trees representative of DBH range of the plot. * * *” Mr. Gibson was subjected to a rigorous cross-examination by defendant because he used a lesser number of trees in his sample plots. Mr. Gibson’s defense was that the uniformity of the Riensche timber types was such that the "tarifs didn’t vary that much.” (Tr 45.) Further explanation is given at Tr 226-228.
 

 [8]
 

 Mr. Gibson believed that one reason for the great disparity between his cruise and that made by Mr. Gartz was his own close attention to determining the growth rate of timber of each type and site between 1974 and 1978, in order to determine the volume of merchantable timber in 1974, whereas Mr. Gartz used broad averages. (Tr 80.)
 

 [9]
 

 Dilworth,
 
 supra,
 
 235 states: "* * * A square sampling pattern [such as used by Mr. Gibson] provides a more accurate, but more expensive, cruise for a given intensity of sampling. Better coverage of the area is provided by the square pattern as compared to the rectangular .pattern illustrated * *
 
 {See
 
 illustration on the preceding page 234.)
 

 [10]
 

 Mr. Gibson testified: "* * * and I have a — an entire folder on eveiything from ’72 through ’79, a folder for each year, that I have kept as a consulting forester for this type of thing and other — other types of reconstruction for capital gains.” (Tr 59.) However, these materials were not brought into the court. Occasional failures to substantiate recollection on the witness stand, by both of the principal expert witnesses, have made more difficult the court’s duty to weigh the testimony.
 

 [11]
 

 The court recognizes the necessity of the department engaging in mass appraisals, with the work broken into various elements, each part completed by different employees, whose reported results make up part of the expert witnesses’ allowable hearsay. Of course, such testimony has a lesser impact than the testimony of a witness who is present in court for cross-examination.
 

 [12]
 

 Mr. Gibson severely criticized the prism 17.36 BAF used by Mr. Gartz, pointing out that it was too small for the brushy subject property (footnote 3,
 
 supra),
 
 and also the use by Mr. Gartz of a 20 BAF stand table for lack of a 17.36 BAF stand table. Mr. Gibson believed that this was one of the reasons for the wide disparity in timber volumes found by the two appraisers.
 
 {See
 
 Tr 461-462.)
 

 [13]
 

 Mr. Sture was graduated by Oregon State University in 1968 with a bachelor’s degree in forest management. After duty with the U. S. Forest Service, he entered the employment of the Department of Revenue in June 1969 and was first concerned with the maintenance of timber inventory under the Oregon ad valorem tax law.